CHIN, J.,
Dissenting.—In my view, the superior court was correct. I would deny the instant writ petition.
The 2014 amendment to Elections Code section 9002 (section 9002) was a legislative reform designed to improve the initiative process. This case sets *355 the precedent establishing whether that section can function as a true reform to achieve its intended purpose, or if it is an empty shell—just another rule that can easily be evaded with a little imagination.
As amended, section 9002, subdivision (a), requires a 30-day period of public review of all proposed initiative measures, during which time the public may make written comments to be transmitted to the measure’s proponents. Section 9002, subdivision (b), provides that during this “public review period, the proponents of the proposed initiative measure may submit amendments to the measure that are reasonably germane to the theme, purpose, or subject of the initiative measure as originally proposed.” The “reasonably germane” language is taken from cases interpreting the single subject rule. (See Californians for an Open Primary v. McPherson (2006) 38 Cal.4th 735, 764 [43 Cal.Rptr.3d 315, 134 P.3d 299].) I agree with the majority that this court has interpreted the term broadly when deciding whether an initiative measure satisfies the single subject rule. But that does not mean the Legislature intended the same broad interpretation in this context. In amending section 9002, the Legislature did not merely incorporate the single subject rule.
We do not have to look far to find the legislative intent behind section 9002. The Legislature itself stated its intent in the bill that led to the amendment. As enacted, the bill stated the Legislature’s intent to do, among other things, the following: “Identifying and correcting flaws in an initiative measure before it appears on the ballot. Currently, proponents of an initiative measure have few options to correct the language of an initiative measure or to withdraw a petition for a proposed initiative measure, even when flaws are identified. This act would give voters an opportunity to comment on an initiative measure before the petition is circulated for signatures. Public comment may address perceived errors in the drafting of, or perceived unintended consequences of, the proposed initiative measure.” (Stats. 2014, ch. 697, § 2, subd. (b)(3).)
Thus, the Legislature intended to improve the quality of initiative measures by requiring a period of public review and permitting amendment to correct flaws that review revealed. As originally introduced, the bill permitted any amendment to the proposed initiative measure. (Sen. Bill No. 1253 (2013-2014 Reg. Sess.) as introduced Feb. 20, 2014, § 5.) The Legislature was concerned about this. As a bill analysis stated, “this bill does not place any limitation on the amendments submitted by the proponents. Consequently, this bill does not prevent a proponent from receiving public comments on the text of a ‘spot’ initiative, and then submitting a substantially revised initiative text to the [Attorney General] after the 30 day public comment period for the ballot title and summary preparation. This scenario *356 renders the public review process meaningless.” (Assem. Com. on Elections and Redistricting, Analysis of Sen. Bill No. 1253 (2013-2014 Reg. Sess.) as amended June 17, 2014, p. 10, italics added.)
It should be obvious the Legislature intended the public review process to be meaningful, not meaningless. It added the “reasonably germane” limitation to ensure that it would be meaningful. Consistent with this Legislative intent, we must interpret section 9002, subdivision (b) in a way that makes the review process meaningful rather than something easily evaded.
The same bill analysis expressed another concern that the “reasonably germane” language was also intended to obviate. “Lurthermore, because this bill does not prevent the submission of a ‘spot’ initiative, the time period that the Legislative Analyst and [Department of Linance] have to prepare the fiscal estimate could be negatively impacted. This bill, which extends the time for the [Department of Linance] and the Legislative Analyst to prepare the fiscal estimate from 25 working days to 50 days, also permits the proponents to submit amendments 5 days after the 30 day public review period. As a result, if the proponents submit an amendment that substantively changes the initiative text, the [Department of Linance] and Legislative Analyst will only have 15 days to prepare a new fiscal estimate.” (Assem. Com. on Elections and Redistricting, Analysis of Sen. Bill No. 1253, supra, as amended June 17, 2014, p. 10.) The Legislature was thus concerned that the fiscal analysis be afforded adequate time.
As even the majority recognizes, “the Legislature intended to improve the initiative process by allowing members of the public to make suggestions to proponents . . . .” (Maj. opn., ante, at p. 347.) In this way, the Legislature enacted the comment period to benefit the public, and not merely the initiative’s proponents. The Legislature made the public comment period mandatory, not optional. The reason is clear. The Legislature wanted to improve the final product. It wanted to permit the public to point out obvious, and not so obvious, flaws in a measure’s drafting so the proponents could correct those flaws before the measure was irrevocably placed on the ballot.
When he signed the amendment to section 9002 into law, the Governor made clear it was intended to benefit the public and not merely proponents of initiative measures. He issued a press release saying that he signed it “to increase public participation in the initiative process and provide better information to voters on ballot measures. [¶] ‘California’s century-old initiative process is a hallmark of our electoral system and today we’re taking an important step to modernize and strengthen direct democracy,’ said Governor Brown. [¶] . . . The measure introduces a 30-day public review period at the beginning of the initiative process. Proponents can amend the initiative in *357 response to public input during that review period.” (Governor Edmund G. Brown, Jr., press release regarding Sen. Bill No. 1253 (2013-2014 Reg. Sess.) Sept. 27, 2014.)
The same press release quoted the bill’s supporters as saying the bill would “ ‘enabl[e] broader debate and public review so that measures can be modified before they go to the ballot, avoiding unintended consequences’ ” and would “ ‘give voters the chance to . . . address flaws if there are problems with the language.’ ” (Governor Edmund G. Brown, Jr., press release regarding Sen. Bill No. 1253, supra, italics added.) It quoted former Chief Justice Ronald George: “ ‘Too often, ballot measures are confusing and poorly written, but there is no chance for initiative backers to make even the most routine changes. This legislation makes common-sense improvements that will help voters understand what their votes mean and enable them to make informed decisions.’ ” {Ibid.)
The majority observes, correctly, “ ‘that the initiative process occupies an important and favored status in the California constitutional scheme,’ ” and we must ‘“guard the people’s right to exercise the initiative power.” (Maj. opn., ante, at p. 351.) But this observation does not mean the initiative process cannot be improved. Exercising its constitutional responsibility to ‘“provide the manner in which petitions shall be circulated, presented, and certified, and measures submitted to the electors” (Cal. Const., art. II, § 10, subd. (e)), the Legislature amended section 9002 to do just that. Nor does this observation mean that a statute like section 9002 that is designed to improve the process should be given a crabbed interpretation that defeats its purpose. In no way does enforcing section 9002 to achieve its purpose diminish the important and favored status the initiative process occupies in our constitutional scheme. It just makes the process work better. Proponents of measures may still circulate what they want. They merely have to provide enough lead time to do so consistent with legal and practical requirements, including section 9002. The proponents of the measure at issue here inform us they did not have enough time to submit the proposed constitutional amendment for public comment. But that is their doing, not the Legislature’s.
Initiative proponents should not be permitted to defeat statutory requirements by submitting for public review a measure vaguely similar to what is ultimately intended, then on day 34 or so, finally showing their hand by substituting something dramatically different, something that will never receive the mandatory public review.
I now turn to the initiative measure at issue here. Certainly, some of the amendments are reasonably germane to the original measure. Some simply eliminate many of the changes in the law concerning juveniles included in the *358 original proposal. But the newly proposed constitutional amendment—the centerpiece of the new initiative measure—is not reasonably germane. It would work a major change in California’s constitutional form unrelated to the original measure.[1] Under the majority’s holding, that constitutional amendment will never receive public comment or the opportunity to amend to correct drafting flaws. But it is entirely different from the original measure.
I must admit the previous sentence is a slight—a very slight—overstatement. Vague similarities exist between the new proposed constitutional provision and the original measure. Both involve the criminal justice system in the broadest sense—the original measure concerned juvenile and, to a lesser extent, youthful offenders; the constitutional amendment concerns mostly adult offenders. To some extent, both involve the potential release of inmates, although in very different ways. To some extent, both involve parole, although in very different ways. But there the similarity ends.
The stated reason for the newly proposed constitutional amendment—“to enhance public safety, improve rehabilitation, and avoid the release of prisoners by federal court order” (amended measure, § 3, adding art. I, proposed § 32, subd. (a))—has nothing to do with juveniles, meaning it has nothing to do with the original measure’s juvenile focus.
Dramatically changing the sentencing laws—by permitting early parole for some offenders, contrary to the detailed sentencing scheme currently in effect—is not reasonably germane to changing the treatment of juvenile and youthful offenders in the criminal justice system. Supposedly avoiding the release of prisoners by federal court order—the purpose the proponents stress in their argument that the measure must qualify for the 2016 ballot—has nothing to do with the original measure.
*359 The constitutional amendment would also give the Department of Corrections and Rehabilitation (department) constitutional authority to award behavior and other credits. The Legislature has already enacted detailed mandatory provisions for the department to award conduct and participation credits. (See Pen. Code, § 2931 et seq.) But the amended measure’s proposed constitutional language is permissive. Presumably, authority to award credits includes authority not to award credits or to award fewer credits than the statutes currently require. Because the Constitution prevails over mere statutes, it appears the proposed constitutional amendment would displace the current statutory provisions for credits and shift authority over such credits from the legislative to the executive branch of government.
For the moment, I will assume that altering the balance of power between the two branches of government in this way would not be an impermissible constitutional revision. (Cf. Legislature v. Eu (1991) 54 Cal.3d 492, 509 [286 Cal.Rptr. 283, 816 P.2d 1309] [finding a 1990 initiative imposing term limits on members of the Legislature was not invalid, as a procedurally defective constitutional revision, because ‘“[n]o legislative power is diminished or delegated to other persons or agencies. The relationships between the three governmental branches, and their respective powers, remain untouched.”].) But shifting power from one branch of government to another is not reasonably germane to the original measure, which left the separation of powers between the branches of government unchanged.
The new constitutional provision would also have an entirely different, and obviously complex, fiscal impact that warrants careful study. Whatever work was done on the fiscal analysis of the original measure would be useless in analyzing the fiscal impact of the proposed constitutional amendment; those responsible for that analysis would have to start from the beginning. The amendment would require at least thousands of new parole hearings, and would presumably require such hearings to be regularly conducted at intervals yet to be determined. Regulations would have to be adopted. Some unknown number of inmates would be released. All this suggests that the 50-day period under section 9002 for the joint fiscal analysis of the new measure should not be reduced to 16 days, as it was here.
I agree with the majority ‘“that the Legislature intended the comment period to facilitate feedback, not to create a broad public forum,” and that the ‘“avenue for public comment” runs ‘“for only one round of suggestions.” (Maj. opn., ante, at pp. 339, 348.) But the Legislature did intend to facilitate feedback and to permit one round of suggestions. The proposed constitutional amendment—the main part of the new proposal—has received no feedback and no round of suggestions. If the court overturns the superior court’s order, it never will receive such comment and cannot be amended.
*360 But the proposed constitutional amendment is exactly the sort of measure that would greatly benefit from public comment and the opportunity to make amendments. Disregarding its merits, public comment could easily expose its drafting flaws. For example:
(1) It seems odd to embed permanently in the California Constitution a reference to a potential “federal court order” in an unnamed piece of litigation. (Amended measure, § 3, adding art. I, proposed § 32, subd. (a).) It is also redundant, as this purpose is already referenced in a preceding portion of the new initiative measure, where it more logically belongs. (Amended measure, § 2, par. 3 [one purpose of the measure is to “Prevent federal courts from indiscriminately releasing prisoners”].)
(2) It seems particularly odd, and pointless, to conclude a statement of purpose with the language, “notwithstanding anything in this article or any other provision of law.” (Amended measure, § 3, adding art. I, proposed § 32, subd. (a).)
(3) More substantively, the constitutional provision never defines the term “non-violent felony offense.” Because the United States Supreme Court recently declared unconstitutional as impermissibly vague the term “violent felony” in a federal statute (Johnson v. United States (2015) 576 U.S._ [192 L.Ed.2d 569, 135 S.Ct. 2551]), the absence of a definition is troublesome, to say the least. The Penal Code contains various lists of crimes satisfying various definitions, including a list of “violent” felonies. (Pen. Code, § 667.5, subd. (c).) Does that statute apply to mean that any crime not listed in it would be a nonviolent felony, even though many such crimes are arguably violent? Can a statute define a constitutional term? What if the Legislature amends the list? What happens if the term “non-violent felony offense” is also found to be void for vagueness? Would that mean all inmates would be eligible for parole? The amended measure could greatly benefit from a definition of the term. Adding such a definition would be possible if the proposal were submitted for public review, but it is impossible under the majority’s holding.
(4) The sentencing laws currently in effect refer to a “principal term” and a “subordinate term.” (E.g., Pen. Code, § 1170.1, subd. (a).) Because the proposed constitutional provision does define “full term for the primary offense” (amended measure, § 3, adding art. I, proposed § 32, subd. (a)(1)(A)), it appears that what is meant is the equivalent of the “principal term.” If so, it might be better to use the same terminology—which has an established meaning—rather than a new term that might suggest something different is intended. Or if, against appearances, “full term for the primary offense” means something different than “principal term,” the difference should be identified.
*361 (5) The proposed constitutional amendment gives the department “authority to award credits earned for good behavior and approved rehabilitative or educational achievements.” (Amended measure, § 3, adding art. I, proposed § 32, subd. (a)(2).) But it does not explain how this new, apparently permissive constitutional provision would interact with the detailed, mandatory provisions for credits the Legislature has enacted. As I have already discussed, the constitutional provision would seem to displace the statutory scheme. But I am not sure that is the intent. Displacing the statutory credit scheme might be one of the measure’s “unintended consequences” the Legislature sought to avoid in amending section 9002. (Stats. 2014, ch. 697, § 2, subd. (b)(3).) If something else is intended—perhaps that any credits the department awards under its new constitutional authority would be in addition to, rather than instead of, the statutory credits—the measure should so explain.
(6) Finally, there is a technical flaw. California Constitution, article I, proposed section 32, has a subdivision (a)(1)(A), but no subdivision (a)(1)(B). Most people are aware that one cannot subdivide something into one part. Public comment and amendment could easily avoid the embarrassment of having the California Constitution contain such a purported subdivision.
Concluding, as I do, that the proposed constitutional amendment is not reasonably germane to the original measure would not significantly hinder the initiative process. It would merely mean that a new measure that is unlike any already proposed would, for the first time, be subject to public comment for 30 days and be amendable if drafting errors and any other flaws are uncovered during that review.
Here, for example, if the proponents were to amend the proposed constitutional provision after the public review process to correct some of the problems identified above, or others revealed in the process, the changes would clearly be germane to the original proposal, and no new review process would be required. But an entirely new, and major, change, such as the proposed constitutional amendment in this case, should not be removed from the process of review and possible amendment. Voters who might agree in principle with an initiative measure should not have to choose between voting for the measure even though it was poorly drafted, or voting against the measure because it was poorly drafted. The Legislature amended section 9002 in 2014 to avoid such a dilemma. It sought to increase the likelihood an initiative measure would be well drafted, so the voters would only have to be concerned with its merits. But for the amendment to section 9002 to function as intended, a new measure that, as a practical matter, is utterly unlike the original, must be subjected to public comment and possible amendment.
*362 Unfortunately, this case has now set the precedent. Under today’s ruling, future initiative proponents can evade the period of public review in the same way the proponents have done here. They merely need to hijack a vaguely similar measure that was in the process of qualifying. But the Legislature never intended section 9002’s mandatory provisions to be so easily evaded. It intended to require a meaningful period of public comment.
Accordingly, I dissent.

 The amended initiative measure was retitled “The Public Safety and Rehabilitation Act of 2016” (amended measure). Section 3 of that amended measure would add section 32 to article I of the California Constitution (article I, proposed section 32) to read: “(a) The following provisions are hereby enacted to enhance public safety, improve rehabilitation, and avoid the release of prisoners by federal court order, notwithstanding anything in this article or any other provision of law:
“(1) Parole consideration: Any person convicted of a non-violent felony offense and sentenced to state prison shall be eligible for parole consideration after completing the full term for his or her primary offense.
“(A) For purposes of this section only, the full term for the primary offense means the longest term of imprisonment imposed by the court for any offense, excluding the imposition of an enhancement, consecutive sentence, or alternative sentence.
“(2) Credit Earning: The Department of Corrections and Rehabilitation shall have authority to award credits earned for good behavior and approved rehabilitative or educational achievements.
“(b) The Department of Corrections and Rehabilitation shall adopt regulations in furtherance of these provisions, and the Secretary of the Department of Corrections and Rehabilitation shall certify that these regulations protect and enhance public safety.” (Amended measure, § 3.)